## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### Northern Division

| | | |
|---|---|---|
| PATRICIA MITCHELL-TRACY, | ) | |
| | ) | |
| Individually and on behalf of a class | ) | |
| of consumers similarly situated | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| vs. | ) | Civil Action No. 1:05-cv-01428-AMD |
| | ) | |
| UNITED GENERAL TITLE INSURANCE | ) | |
| CO. and FIRST AMERICAN TITLE | ) | |
| INSURANCE CO., | ) | |
| | ) | |
| Defendants | ) | |
| _____ | ) | |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF
## MOTION FOR CERTIFICATION OF THE CLASS

Richard S. Gordon, Federal Bar No. 06882
Kieron F. Quinn, Federal Bar No. 00393
QUINN, GORDON & WOLF, CHTD.
102 West Pennsylvania Ave., St. 402
Baltimore, Maryland 21204
(410) 825-2300

Philip Friedman, Federal Bar No. 22766
FRIEDMAN LAW OFFICES, PLLC
2401 Pennsylvania Ave., N.W., Suite 410
Washington, DC 20037
(202) 293-4175

Philip Foard, Federal Bar No. 00280
Foard, Gisriel,O'Brien & Ward
29 W. Susquehanna Ave., Suite 302
Towson, MD 21204
(410) 296-1440

Attorneys for Plaintiffs

1

## Table of Contents

Page

Introduction .................................................................................................................... 1

I.    Factual  Background ................................................................................................ 2
      a.    The Allegations of the Complaint    ................................................................. 3
      b.    The Business of Title Insurance    ................................................................... 5
      c.    The Statutory Regulation of Title Insurance Premiums    ................................. 10
            i.    Maryland is a Filed Rate State ................................................................ 10
            ii.   Each of the Defendants have filed a discounted "Reissue
                  Rate" with the State of Maryland ................................................... .  12
      d.    In Maryland, Title Insurers, Such as the Defendants, Work Exclusively
            Through Appointed "Agents" ................................................................ 16
      e.    The Title Insurance Industry Is A Cash Cow ................................................ 19
      f.    The Named Plaintiffs in This Case ................................................................ 20
            i.    Patricia Mitchell Tracey ................................................................ 20
            ii.   Milton Brown and Fracine Byrd-Brown ................................................ 23
            iii.  Helen Klatsky ................................................................ 24
            iv    The Class is not limited to the Named Plaintiffs ................................. 25

II.   The Court Should Certify the Class in this Case ................................................ 27
      a.    Governing Principles ................................................................ 27
            i.    Rule 23 favors certification ................................................................ 27
            ii.   This is the very type of case for which the class action
                  mechanism was established ................................................................ 29
      b.    Legal Requirements for Certification ................................................................ 29
            (a)(1) Numerosity ................................................................ 30
            (a)(2) Commonality of Issues ................................................................ 31
            (a)(3) Typicality of Claims ................................................................ 34
            (a)(4) Adequacy of Representation ................................................................ 36
      c.    A Class Action Is Appropriate Because the Criteria of Rule 23(b)
            Are Satisfied ................................................................ 37
            Rule 23(b)(1) ................................................................ 37
            Rule 23(b)(2) ................................................................ 39
            Rule 23(b)(3) ................................................................ 40

III.   Courts I Three Different States Have Recently Certified Virtually
       Identical Class Actions ……………………………………………………     44
       a.      In New York State, The Court Certified In Re Coordinated Title
               Insurance Cases ………………………………………………     45
       b.      In Ohio, the Appellate Court Recently Reversed the Denial of
               Class Certification ……………………………………………     45
       c.      The Minnesota Courts, as well, Certified an Identical Class Action ……………     46

IV.    Conclusion ………………………………………………………………     47

## List of Unreported Cases

*Singh v. Prudential Health Care Plan*, Civil Action No. AW-00–2168 (U.S. Dist. Ct. Md.)
Attached as Exhibit 33  ……………………………………………………………..     44

**Introduction**

This case challenges a uniform and illegal practice of the Defendants, First American Title Insurance Co. ("First American") and United General Title Insurance Co. ("United General") for which Plaintiffs seek both declaratory relief and damages on behalf of themselves and potentially thousands of other victims of that practice. As set forth below, the case should be certified as a class action "as soon as practicable" (*Fed.R.Civ.P.* 23) because it easily meets all of the requirements of the Class Certification Rule.

Based upon the allegations of this case, and subsequent discovery, Plaintiffs propose two classes consisting of the following individuals:

**First American Class**

All persons or entities in Maryland who within 10 years of having previously purchased title insurance in connection with their mortgage or fee interest, refinanced the identical mortgage or fee interest, and were charged a title insurance premium by First American that exceeded the applicable premium discount or "reissue rate" for title insurance on file with the Maryland Insurance Administration that such persons or entities should have been charged.

**United General Class**

All persons or entities in Maryland who within 10 years of having previously purchased owner's title insurance in connection with their mortgage or fee interest, refinanced the identical mortgage or fee interest, and were charged a title insurance premium by First American that exceeded the applicable premium discount or "reissue rate" for title insurance on file with the Maryland Insurance Administration that such persons or entities should have been charged.

Because Defendants' scheme to cheat consumers – as described in detail below – was uniform and consistent, relied upon standard forms, contracts and other documents, involved their own agents and victimized literally thousands of consumers, the Court should certify the two Classes at this time.

## I.    FACTUAL  BACKGROUND

There is one principal issue here, and all Class members, in each of the proposed classes,[1] stand in the identical posture with respect to that issue and with respect to the Defendants – namely, whether Defendants and their appointed agents properly gave borrowers refinancing their mortgage loans, the discounted "reissue rate" – a full 40% off of the standard rate – under Defendants filed rates with the Maryland Insurance Commission.  The case, therefore, is much like other straightforward consumer cases which are routinely certified as class actions by courts in Maryland and elsewhere.   In fact, the United States Supreme Court in *Amchem Products, Inc. v. George Windsor, et al.*, 521 U.S. 591 (1997) noted that cases "alleging consumer or securities fraud or violations of the antitrust laws" are especially appropriate for class action treatment.   *Id.* at 625.   *Accord Arrington v. Colleen, Inc.*, 2001 WL 34117734 (D.Md.)  (certifying consumer class alleging TILA violations); *Peoples v. Wendover Funding, Inc.*, 179 F.R.D. 492 (D.Md. 1998) (certifying a class of consumers alleging violations of the Fair Debt Collections Act); *Chisolm v. TranSouth Financial Corp.*, 184 F.R.D. 556, 562-63 (E.D.Va. 1999) (certifying consumer class action alleging violations of RICO); *Twyman v. Rockville Housing Auth.*, 99 F.R.D. 314 (D. Md. 1983) (a class of over 150 low-income public housing tenants certified as to practices by the Housing Authority involving rent, eviction and maintenance).

On the issues presented in this case, the Court generally *must* assume that the allegations in the complaint are true for purposes of class certification, though "[i]t is appropriate to conduct controlled discovery into the 'merits,' limited to those aspects relevant to making the certification decision on an

---

[1] Plaintiffs propose two classes rather than one in this case because First American and United General's title insurance rates filed with the Maryland Insurance Administration vary slightly, though not appreciably.  As discussed in Part I (c) below, Defendant First American's rates call for the discounted "reissue rate" if the borrower had a previously issued

informed basis." *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 365 (4th Cir. 2004) (quoting Fed.R.Civ.P. 23 advisory committee's note to 2003 amendments). *See also Blackie v. Barrack*, 524 F.2d 891, 901 n. 17 (9th Cir. 1975), *cert. denied* 429 U.S. 816 (1976); *Longden v. Sunderman*, 123 F.R.D. 547, 551 (N.D. Tex. 1988); *Keasler v. Natural Gas Pipeline Co. of Amer.*, 84 F.R.D. 364, 365 (E.D. Tex. 1979). Such controlled discovery in this action confirms the class allegations set forth in the Plaintiffs' Amended Complaint (hereinafter "Complaint").

### a.    The Allegations of the Complaint

This is a class action by homeowners seeking relief from the predatory practices of two title insurance companies – United General Title Insurance Company ("United") and First American Title Insurance Company ("First American"); (collectively "Defendants") – for violations of statutory and common law obligations. Complaint at ¶ 1.

The purpose of the Defendants' scheme to cheat consumers is simple – to circumvent the requirement of both federal and state law, including the Real Estate Settlement Procedures Act ("RESPA"), by systematically charging Maryland consumers who refinance their mortgages premiums for title insurance that are far in excess of the rates permitted under Maryland law. *Id.* Thus, instead of charging consumers a forty percent (40%) discounted premium filed with and approved by the Maryland Insurance Administration ("MIA") as the tariffed "reissue rate" for Maryland purchasers of title insurance who refinance their mortgages *within ten years* of a previously issued title insurance policy, Defendants, through their agents and/or employees, actually collected a much higher premium – the "original issue rate" **or more** – from the Plaintiffs and Class members. Complaint at ¶ 3. Rather than

---

Owners or Lender's title insurance policy. United General's rates, on the other hand, require the discounted "reissue rate" if the borrower had a previously issued Owner's title insurance policy.

provide the "Best Rate" filed with the MIA for which the consumer qualified, as required under Maryland law, the Defendants charged the Plaintiffs and Class members an amount of money they were neither entitled to have nor receive.  Complaint at ¶¶ 3, 23.

As a direct result of the Defendants' illegal acts, the named Plaintiffs allege that they and the Classes were damaged and suffered injury and loss.[2]  This lawsuit also asserts that this scheme to cheat consumers was not isolated or particular to the named Plaintiffs, but was uniform, consistent and repeated over-and-over again.  Complaint at ¶¶s 57-67.  Hundreds and perhaps thousands of consumers who refinanced their loans and were eligible for a reissue rate never obtained the rate entitled to them under Maryland law.  Rather, in violation of both Maryland and Federal law the Defendants simply took for themselves what never belonged to them.  Complaint at ¶¶ 56.

The scheme in this case is virtually identical, in both scope and allegations, to other class action reissue rate cases that have come before other courts in the past two years.  *See e.g. Dubin v. Security Title Insurance Co.*, 832 N.E.2d 815 (Ohio 2005) (certifying class action alleging, like this case, that defendants  failed to provide the reissue rate);  *In re Coordinated Title Insurance Cases*, 784 N.Y.S.2d 919, 2004 WL 690380 (N.Y. Sup. 2004) (certifying class against insurers, including First American, for uniformly failing to provide the reissue rate discount);  *Mitchell v. Chicago Title Insurance Co.*, 2003 WL 23786983 (Minn. Dist. Ct.) (certifying class against insurers, alleging that insurers, either directly or

---

[2] *See e.g.*  Complaint at ¶ 56 ("Despite full knowledge that the named Plaintiffs and the Class members were eligible for a "reissue rate," the Defendants willfully and knowingly overcharged the Plaintiffs and other Class members insurance rates in excess of filed rates); ¶¶s 69-72 ("Defendants assessed and collected premiums…[to which] they had, and have no right to at law or in equity…[and] Plaintiffs and members of the Class have been damaged."); ¶ 86 ("Defendants knew, or had reason to know, the Plaintiffs would reasonably rely on the representations and/or omissions and concealments which, as erroneous, would cause loss, injury or damage."); ¶ 91 ("In furtherance of said conspiracy, Defendants both individually and in concert with local title agents committed the overt acts or omissions alleged herein, to the economic loss and injury of Plaintiff and Class members.").

through their title agents, charged premiums for title insurance policies in excess of the applicable rates in connection with refinancing transactions).

### b.    The Business of Title Insurance

Title insurance is an essential part of virtually every real estate transaction.  Title insurance guarantees that the purchaser or borrower owns a parcel of property free and clear of all liens and encumbrances except as specifically disclosed in the title policy.  *See* Exhibit 1, United General Webpage "Information for Home Buyers and Sellers" and Exhibit 2, ALTA Webpage "Questions About Title Insurance."  As noted on the website of Defendant First American, title insurance "is an insurance policy that protects the insured against loss should the condition of title to the land be other than as insured."  Exhibit 3,  First American Webpage "Title Insurance FAQs."

Defendant First American is one of the largest title insurance companies in the United States. "In February 2005, United General Title Insurance Company became part of First American Title Insurance Company."  Exhibit 4, United General Webpage "Welcome to United General."

As noted by witnesses testifying for First American and United General, there are two types of title insurance policies: (1) Owner's policies and (2) Lenders' policies.  Owners' policies are those in which the property owner is the insured; these policies protect the homeowner's property interests and typically provide coverage in an amount equal to the purchase price.  The Owner's policy is issued "almost exclusively" at the time of purchase by the buyer of the property.  Deposition of Mark Lynch at

47, attached hereto as Exhibit 5 ("Lynch depo"); Deposition of John Kosogof at at 37, attached hereto as Exhibit 6 ("Kosogoff depo").[3]

Lender's policies are those in which the lender/mortgagee is the insured; this coverage protects a lender's security interest in the property and typically provides coverage in an amount equal to the amount of the secured loan. *See* Lynch depo at 50-51; Kosogof depo at 43-46.

At least "90 to 95 percent" of all home buyers purchase an Owner's policy, Lynch depo at 49, and the Lender's policy is issued in virtually ***every*** first mortgage transaction. *See* Lynch depo at 51; Kosogof depo at 44-45. In fact, on its Website, First American represents to consumers that: "***When you purchased your home, you probably paid for Owner's and Lender's Title Insurance Policies***." Exhibit 8, First American Webpage "Refinancing FAQ's" (emphasis added).

Regardless of which type of title insurance policy is purchased, the premium is only paid once – at closing – ***typically by the borrower***. Lynch depo at 50-52; Kosogoff depo at 40, 43. The Owner's coverage remains in effect as long as the consumer owns the home; the Lender's policy remains in effect until the mortgage loan is satisfied. Lynch depo at 50; Kosogoff depo at 40. United General's and First American's form Owner's and Lender's policies are standard in the industry – that is, the policy form itself, is grounded upon a uniform and standard model adopted and approved by the American Land Title Association ("ALTA""), a "national trade association made up of title insurance professionals." *See* Lynch depo at 53-54, 61-62; Kosogof depo at 54-56.

A typical purchase transaction involves the issuance of both types of title insurance policies. For

---

[3] Plaintiffs have attached the complete deposition transcripts of Messrs. Lynch and Kosogof, as well as the deposition transcript of Jacob Gregori – one of the title agents – as Exhibits 5, 6 and 7.

example, if an individual buys a home for $100,000 and takes out an $80,000 mortgage to finance the purchase, the owner receives an Owner's title insurance policy in the amount of $100,000 that lasts for as long as that person owns the home. The lender receives a Lenders' policy in the amount of $80,000, that lasts for as long as the mortgage remains unsatisfied.  Although the lender is the insured under the Lenders' policy, the owner typically pays for both policies.

Typically, a refinance transaction involves the issuance of a Lender's policy only.  Thus, if the same individual in the previous example decides to refinance the loan, the new lender will receive a Lender's policy in the amount of the new loan.  The Owner's policy, issued in connection with the initial purchase of the home, remains in force.  The homeowner pays for the new Lenders' policy.  First American Webpage "Refinancing FAQ's," Exhibit 8.

The process by which title insurers, like First American and United General, issue a title insurance policy is the same *in every case*.  As described by the witnesses for both Defendants in this case, there are six basic steps that are usually followed in somewhat the same order in every real estate transaction:   (1) opening the title order and referral to the title agent; (2) title search; (3) title examination; (4) issuance of the title insurance commitment; (5) settlement/closing the transaction; and (6) issuance of the Title Policy.

The typical refinance transaction, such as the transactions at issue in this case, begins when the owner of the property arranges for a refinance loan from a lender.  Typically, the lender selects the title insurance agent and notifies the agent of the need for title insurance and a settlement of the refinancing transaction.  The agent, through an abstractor, searches the title, which typically reveals both: (1) the existing mortgage; and (2) the date that the property was purchased.   This process often takes place as

much as a month before the loan closing.  Kosogoff depo at 97; Lynch depo at 109-110.  A title examination – a review of the abstract that looks for defects in the title or other prior liens – then takes place.  Kosogoff depo at 97-98; Lynch depo at 115.

At this point in the process the consumer/borrower has not met or spoken to either the title agent or the insurer.  In fact, in the standard transaction in Maryland, the only prior contact that a borrower may have with the title agent is the call setting up the time for the closing.  Kosogoff depo at 119. *See also* Lynch depo at 115.

 The agent typically selects the title insurance underwriter and obtains a title commitment from the underwriter to issue a lender's title insurance policy.  The title commitment is a key document in this process.  It is a standard form that memorializes the insurer's agreement to issue the policy to the insured.  In the title commitment, the title agent states the type of policy(s) that the insurer will underwrite and binds the insurer to issue that particular coverage if the loan closes.  Lynch depo at 121-22; Kosogof depo at 100.

Mr. Lynch during his deposition, explained that the "Title Commitment" is binding on the insurer:

| | |
|---|---|
| Q. | ... A commitment is a title insurance document and commits the company, First American, to insure. |
| LYNCH. | I would say that's a fair statement. |
| Q. | And a commitment is issued by the title agent, correct? |
| A. | Correct. |
| Q. | When the title commitment is issued at that point is it fair to say, again, the borrower does not have contact with the title agent? |
| A. | I would say that's typical. |
| Q. | And again they may not even know who the title agent is. |
| A. | That often happens. |
| Q. | And they also may not know that First American is or is not part of the transaction at this point? |
| A. | That's a fair comment. |

11

| Q. | But certainly First American has been selected as the insurer by this point. |
|---|---|
| A. | Our name would either be on the commitment or not. |
| Q. | So that's a yes. |
| A. | I would say that's a yes. |
| Q. | Okay.  The commitment is the actual document that commits First American to insure. |
| A. | Correct. |
| Q. | And the decision as to which company to go with and which policy to issue is within the bailiwick of the agent, correct? |
| A. | Correct. |

Lynch depo at 121-122.  Mr. Lynch added that the typical, uninformed consumer has "very little" input into this process.  *Id.* at 122.[4]  *See also* Kosogof depo at 101 (agreeing that the "borrower ... does not participate in the title commitment").

At the closing, the agent is clearly in charge.  The agent handles the actual closing of the transaction.   The agent pays off the earlier mortgage from the new loan proceeds and obtains appropriate releases.   The owner signs the settlement sheet (known as the "HUD-1") and other documents presented by the agent.  To complete the transaction, the agent releases the prior loan and records the release, records the appropriate documents to update the public record and issues the title insurance loan policy paid for by the borrower.

Typically, the closing is the first time that the consumer/borrower meets the agent. Lynch depo at 135; Kosogof depo at 118-119.  Even though the closing may be the only contact that the consumer has with the title agent or the insurer, neither First American nor United General have or require the use of a form to advise consumers of their various options for title insurance.  Lynch depo at 74; Kosogof depo at 119-20.  Nor do Defendants ever disclose to the borrowers that they may qualify for the discounted

---

[4] United General's testimony on this point was completely consistent.  The title commitment is a standard form that is issued in every transaction with roughly the same pieces of information.  Kosogof depo at 107-110.

Reissue Rate. Kosogof depo at 119-20. Nor, as was established during discovery, and as discussed in greater detail below, do Defendants conduct *any* oversight, audits or reviews of their agents to insure that consumers are given the reissue rates to which they are entitled. *See* Part Id.

Finally, after the closing, the agent, often a month or two later, issues the title insurance policy.

### c.    The Statutory Regulation of Title Insurance Premiums

#### i.    *Maryland is a Filed Rate State*

All title insurers (including First American and United General) are governed by the Maryland Insurance Code which provides that a Title Insurer must file "all rates or premiums, supplementary rate information, forms of contracts, policies, or guarantees of insurance, and all modifications of contracts, policies, or guarantees of insurance that it proposes to use" with the Maryland Insurance Administration. Md. Code. Ann., Insurance § 11-403(a)(1) & (2). Moreover, Maryland law provides that: "Premiums for title insurance shall be set out clearly and subject to the approval of the Commissioner." Md. Ins. Code Ann. §22-101.

As title "Insurers" selling title insurance in Maryland, both First American and United General are obligated to "hold to the rates or premiums as approved by the Commissioner …" and may "…not deviate from the rates or premiums . . ." so approved. Md. Code Ann., Insurance § 11-407(b). In addition, Title Insurers such as the Defendants, are prohibited from making or issuing any "contract, policy or guarantee of insurance except in accordance with filing approved as provided in this subtitle . . ." *Id*. at § 11-407(a).

Moreover, the MIA requires all property and casualty insurers, including title insurers,[5] to follow the "***Best Price Rule***."  Under this rule, First American and United General  "***must always place a consumer in the most favorably priced tier for which the consumer qualifies***." *See* MIA's General Guidelines at 11, attached hereto as Exhibit 9.

For their parts, both First American and United General not only readily agree that in Maryland "the rates are the rates," without exception, but also that the rates of each company have been uniform and consistent for nearly a decade ***and must be followed to the letter***.  For example, Mr. Kosogof, testifying on behalf of  United General, described how the Filed Rate works:

| | |
|---|---|
| Q. | This document was also produced to the plaintiffs as part of discovery in this case and it's Bates number is UGT 00561 through UGT 00567.  Are you familiar with this document? |
| KOSOGOF: | Yes, these are the filed rates. |
| Q. | And this was effective as of May 20, 1996. |
| A. | Correct. |
| Q. | And they are still in force nine and a half years later. |
| A. | Correct. |
| Q. | They have not changed. |
| A. | No. |
| Q. | And you need approval for filed rates, do you not? |
| A. | Correct. |
| Q. | You have to go through the Maryland Insurance Administration. |
| A. | Correct. |
| Q. | And you have to justify the rate; is that correct? |
| A. | Correct. |
| Q. | And as we have already gone over the rate must be adhered to to the letter, correct? |
| A. | Correct. |

Kosogof depo at 175-76.

---

[5] Title insurance is considered "Property and Casualty" insurance in Maryland and must follow the rules and guidelines that pertain to such insurance.  Lynch depo at 57-58.

Mr. Lynch, who is agency counsel for First American and is chiefly responsible for oversight of

the agents in Maryland, not only agreed, but also noted that any deviation from the Filed Rate would be

illegal:

| | | |
|---|---|---|
| Q. | | … Maryland is a filed rated state, correct? |
| LYNCH. | | Correct. |
| *Q.* | | *And the rates cannot be deviated from.* |
| *A.* | | *Not lawfully.* |
| *Q.* | | *So if there was a deviation from the filed rate that would be a violation of the law.* |
| *A.* | | *Correct.* |
| Q. | | Is it fair to say that the rates for First American in Maryland have not changed much since 1998? |
| A. | | It would be fair to say they haven't changed at all since 1998. |
| Q. | | So the rates that were the place in 1998 would be the same rates today. |
| A. | | Correct, in Maryland. |

Lynch depo at 58-59 (emphasis added). Mr. Lynch added that, with respect to the insurers' appointed

agents, "*We expect and presume that they are following the filed rated*." Lynch depo at 97 (emphasis

added).

### ii. *Each of the Defendants have Filed a Discounted "Reissue Rate" with the State of Maryland*

As noted above the "Filed Rates" during the entire class period were uniform, consistent and

mandatory.   United General and First American each have two different rate tiers relevant to this case:

(1) the Standard Rate; and (2) the Reissue Rate (which provides a 40% discount off of the Standard

Rate).   The Standard Rate is the default rate; if the Reissue Rate does not apply, then customers receive

the Standard Rate.   Whatever rate is used, the calculation of that rate is simple and straightforward.

Lynch depo at 144 (the calculation of the applicable rate "is a mathematical certainty"); Kosogof depo at

145 (determination of the rate is "simple math").

15

The Reissue Rate is a discounted rate that reflects the fact that when only a few years have passed – as many as 10 years – since the issuance of the previous title insurance policy, there is a reduced risk of title defects or other problems that may cause claims against the new title insurance policy, and also less work involved in examining the title for defects.[6]  Thus, if the standard rate for a Lender's policy is $2.50 per $1,000 of coverage – *i.e.*, a $100,000 policy would cost $250 – a borrower entitled to the filed Reissue rate would pay 40% less, or $1.50 per $1,000 of coverage – *i.e.*, a $100,000 policy would cost only  $150.

During the class period, the "Filed Rate," for First American, is as follows:

A REISSUE RATE FOR A "FIRST MORTGAGES" TITLE INSURANCE POLICY IS APPLICABLE IF ANY OF THE FOLLOWING APPLY:

(A)     WHEN, WITHIN TEN (10) YEARS PRIOR TO THE APPLICATION FOR MORTGAGEE INSURANCE, A POLICY HAS BEEN ISSUED ON THE IDENTICAL PROPERTY TO THE MORTGAGOR AS OWNER.

(B)     WHEN, WITHIN TEN (10) YEARS PRIOR TO THE APPLICATION FOR MORTGAGEE INSURANCE, A MORTGAGEE POLICY HAS BEEN ISSUED FOR THE SAME MORTGAGOR ON THE SAME PROPERTY.[7]
                *              *              *
THE REISSUE RATES, WHEN APPLICABLE AS OUTLINED ABOVE (SEE SECTIONS (A), (B), AND (C) ABOVE), SHALL BE 60% OF THE PUBLISHED RATES IN FORCE FOR ORIGINAL INSURANCE.

---

[6]The rationale for the discounted rates was clearly explained by Kenneth Harney, in a syndicated  real estate column in the Washington Post  exploring the overcharging practices at issue herein:

The rationale for the discount pricing is straightforward: If you refinanced and paid for a full price title search and insurance policy in 2001, a title search for your latest refi in 2003 need only focus on a short period of time.  Moreover, the likelihood of title related claims airing from that short time period is remote.

*See* Exhibit 11  at 2 (Harney article as cited in "Reissue rates - Reminder").

[7] First American's Reissue Rate is also applicable when a developer subdivides a tract of land, though that situation is not at issue in this litigation.

Exhibit 10 at 7-9.

Thus, by a plain reading of First American's Filed Rate, First American and its agents must provide consumers with the discounted Reissue Rate when: (1) a prior Owner's title policy on the identical real property issued within the past 10 years; or (2) a prior Lender's policy, issued for the same borrower on the same property, issued within the past 10 years.  Lynch depo at 164.  **Any evidence whatsoever** of a prior Owner's or Lender's policy, creates the entitlement under First American's Filed Rate.  Lynch depo at 166-167 (noting that "[t]here are various .... ways to satisfy that requirement").

During the class period, the "Filed Rate" for United General was similar, though slightly narrower, and required that United General and its agents automatically charge only the discounted Reissue Rate in the following circumstance:

> WHEN THE OWNER OF PROPERTY ON WHICH APPLICATION IS MADE FOR MORTGAGE TITLE INSURANCE HAS HAD THE TITLE TO SUCH PROPERTY INSURED AS OWNER WITHIN TEN (10) YEARS PRIOR TO SUCH APPLICATION, SUCH OWNER **SHALL BE ENTITLED TO** THE FOLLOWING REISSUE RATES ON SUCH MORTGAGE INSURANCE UP TO THE FACE AMOUNT OF SUCH OWNER'S POLICY, PROVIDED THIS COMPANY IS PROVIDED WITH A COPY OF AN OWNER'S POLICY ISSUED BY THIS COMPANY OR BY ANOTHER COMPANY LICENSED TO DO BUSINESS IN MARYLAND.  THE REISSUE RATE SHALL BE 60% OF THE ORIGINAL RATE FOR FIRST AND SECOND MORTGAGE.

Exhibit 12 (emphasis added).

Although United General's rate does not state who must "provide" the policy, Mr. Kosogof, United General's deposition designee, readily admitted that United General's title agents may have a duty to obtain and provide the policy.  Kosogof depo at 185.   Nor does the rate state the specific timing

for production of the prior policy – it can be produced even at the closing, which is the first time that the most consumers will meet someone from the title agency. Kosogof depo at 118. [8]

The limited discovery in this case, to date, establishes that all of the information necessary to trigger entitlement to discounted Reissue Rate – whether considering First American or United General's Reissue rate – is ***readily available*** to the Defendant insurers and their agents from standard forms and documents used ***in every transaction***. At a minimum, the Title Commitment provides all the information necessary to determine whether a prior policy exists. The Title Commitment, which is prepared by the Defendants' appointed agents off of standard forms, will identify whether the property was purchased or refinanced within the previous 10 years. As Mr. Lynch from First American candidly

---

[8] In *Dubin v. Security Union Title Insurance Co.*, 832 N.E.2d 815 (Ohio 2005), the plaintiffs grounded a class action on defendants' systemic and illegal overcharges. The lower court had denied class certification in *Dubin*, finding that the requirement under Security Union's Filed Rate that consumers had to produce the prior title insurance policy in order to be entitled to the discounted premium, would require a file-by-file review. *Id.* at 818-19. This requirement is virtually identical to United General's Filed Rate in this case.

In reversing the lower court, the Ohio Appellate Court looked to the New York reissue rate case, *In re Coordinated Title Insurance Cases*, 784 N.Y.S.2d 919, 2004 WL 690380 (N.Y. Sup. 2004), and determined that a file-by-file review was not necessary:

> Here, identical claims run throughout the case for all class members asserted by the appellants. There is "generalized evidence" pertaining to the matter on a class-wide basis. Class members in this case would potentially be all consumers who were entitled to discounted refinancing rates but were actually charged a higher rate through practices of Security Union. In a similar New York state case, the New York court granted certification of a class consisting of "all persons or entities in New York State who have refinanced their mortgages ... within ten (10) years ... and were charged a premium by defendant in an amount in excess of the reduced premium to the applicable loan rate filed." *In re Coordinated Title Ins. Cases.*

> Security Union, in opposing class certification here, makes an argument similar to the one the New York court rejected – that the transaction-by-transaction differences between the individual customers and Security Union would cause individual issues to predominate. ***In rejecting that argument, the New York court held that it is apparent that the governing laws are broken when the rates that "shall" be charged are not.*** That court concluded, "***In logical terms, it is not plausible to think that a consumer, made aware of the opportunity to save hundreds of dollars, would choose to pay the higher rate and forego a savings mandated by law.***"

> The same logic applies to the case at bar.

*Dubin*, 832 N.E.2d at 821 (citations omitted)(emphasis added).

concluded, this information, in and of itself, raises a "significant presumption" that the consumer meets the conditions that should give rise to the Reissue Rate. Lynch depo at 165-166.

Regardless, many consumers in Maryland who are entitled to the Reissue Rate discount from these Defendants are not receiving it. Although there may be several reasons why consumers are uniformly and consistently denied the Reissue Rate, one reason that came to light during discovery is especially noteworthy. Although United General's Filed Rate is not specific as to when a prior policy must be provided, United General's *Escrow & Settlement Guidelines*, attached hereto as Exhibit 13, contain a different mandate.

In particular, United General's *Escrow & Settlement Guidelines*, which its own agents ***must*** adhere to, Kosogof depo at 170, instructs agents as follows:

> [D]o not give reissue credit unless you have received the prior policy before you begin your current title search.

United General's *Escrow & Settlement Guidelines* at 18 (emphasis in original).

The problem with this instruction, however, as noted above, is that at the time that the agents perform the title search – or abstract – the agent, admittedly, has had no contact with the consumer. Thus, the instruction from United General's *Escrow & Settlement Guidelines*, which is not part of the Filed Rate but still is uniformly applied in Maryland, creates a condition precedent that runs counter to the plain language of the United General's Filed Rate. Indeed, United General's *Escrow & Settlement Guidelines* create an impossibility of performance in complying with Maryland's tarriffed rates by creating additional and unnecessary conditions to the consumer receiving the proper Reissue Rate.

It also is in violation of Maryland law that requires that: "Premiums for title insurance shall be set out clearly and subject to the approval of the Commissioner." Md. Ins. Code Ann. §22-101.

19

>    **d.    In Maryland, Title Insurers Such as the Defendant, Work Exclusively through Appointed "Agents"**

In Maryland, Defendants do not sell title insurance directly to the public, but rather, through agents.  "A title agent is someone that issues, underwrites, and sells title insurance policies for an insurance company."  Kosogof depo at 61.  *See also* Lynch depo at 69.  In order to serve as a title agent for one of the Defendants in this case, a title agent must be "appointed" by the insurer under a protocol established by Maryland law.  Md. Ins. Code Ann. §§ 10-101, *et seq.* (2005).

The process of appointing a title agent is the same statewide and results in the title agent having extraordinary authority to act on behalf of insurer – in this case, First American and United General. Mr. Lynch describes First American's approach:

> Q.         [A]t some point there is a formal statutory appointment of the agent.
> LYNCH.     Correct.
> Q.         And they are acting on First American's behalf to issue policies.
> A.         Correct.
> Q.         To apply rates.
> A.         Correct.
> Q.         To conduct underwriting.
> A.         To a degree, correct.
> Q.         In fact, the agent is the one who makes the determination ultimately as to which policy of First American's will be issued.
> A.         Correct.

Lynch depo at 70-71.  United General's approach is the same:

> Q.         Does United General issue any of its own policies in the state of Maryland?
> KOSOGOF    No.
> Q.         It's all done through agents.
> A.         Correct.
> Q.         And as I understand it, agents are appointed in Maryland.
> A.         That is correct.
> Q.         Agents are appointed as your agent for the purpose of issuing title insurance.
> A.         Correct.
> Q.         And for the purpose of underwriting title insurance.
> A.         Correct.

Q.            And for the purpose of charging rates.
A.            Correct.

Kosogof depo at 70-71.

As the limited discovery to date already establishes, the authority of the title agents to act on behalf First American and United General is not only statutory, but also contractual.  The Defendants' standard title agent appointment agreement grants plenary authority to the title agents to issue insurance on behalf of the insurer and permits the agent to bind the insurer.  *See e.g.* Contract between United General and its appointed agent, Custom Title & Escrow, attached hereto as Exhibit 14; Contract between First American and its appointed agent, Express Financial Services, attached hereto as Exhibit 15; Kosogof depo at 70-71 (The agency agreements are standard United General forms).

Despite the authority contractually delegated by both Defendants to their appointed agents, discovery establishes that First American and United General provide virtually no training or oversight to their agents, especially when it comes to whether the agents are charging the proper rates on the policies issued on behalf of the insurers.  Kosogof depo at 174; Lynch depo at 98.  Although the Defendants are required under Maryland law to conduct annual audits of their agents, neither First American nor United General include in their audits a review of the number of times that the agents have applied the Reissue Rate.  Kosogof depo at 83.  Nor do the audits review whether the Reissue Rate is properly assessed.  Kosogof depo at 83.[9]

In fact, other than answering questions affirmatively put to them by their agents, neither Defendant has a proactive system in place to determine when their agents are properly crediting the

borrowers the Reissue Rate to which they are entitled under the Filed Rates. Kosogof depo at 83-89; Lynch depo at 97-98 ("We make resources available to them to educate them on reissue rates, but we do not supervise them directly on the issuance of individual policies and whether specific rates were applied. It would defeat the point of having agents").

Custom Title & Escrow, one of United General's agents, whose owners and employees had very limited experience in the title industry prior to their appointment as an agent of United General, Gregori depo at 33-35, testified that the only information that Custom Title received from United General was "Manuals." United General provided Custom Title & Escrow *no training, oversight or seminars*. Gregori depo at 38-40.

### e.    The Title Insurance Industry is a Cash Cow

Given the fact that title insurance is required in virtually every residential real estate transaction, it is not surprising that the industry is extraordinarily profitable. One Court recently noted that "[n]ews reports indicate that title insurers pay out 47 cents for every $10 collected." *In re Coordinated Title Insurance Cases*, 784 N.Y.S.2d 919, 2004 WL 690380, *2 (N.Y. Sup. 2004). In an article appearing in CNNMoney.com *this month*, it was reported that the title insurance industry is making billions of dollars at the expense of consumers:

> The profits involved appear to be significant. Nationwide, only a tiny percentage of premiums are returned to consumers to settle claims.
>
> In 2003, according to ALTA, the industry paid out about $662 millions. That's just over 4 percent of the $15.7 billion taken in as premiums. Auto insurers, in contrast, paid out

---

[9] On December 19, 2005, Judge Gauvey Ordered Defendants to produce any audits for the agents involved in the named Plaintiffs transactions that included any mention or review of Reissue Rates. The Defendants have since advised that no such audits exist.

75 percent of collected premiums, according to the American Insurance Association (AIA).

CNNMoney.com, January 11, 2006, attached hereto as Exhibit 16.

In Maryland, this disparity for First American and United General, is in line with the national average. As set forth in the FY 2004 Fiscal Year Report of the Maryland Insurance Administration, First American *in Maryland* collected $47,115,620 in premiums but paid less than $1.5 million, or 3% of its income, in claims.   United General paid out just over 5% in claims out of the $3,473,500 in premiums collected from Marylanders.  *See* FY 2004 Fiscal Year Report of the Maryland Insurance Administration at 140, attached hereto as Exhibit 17.

Given the enormous profit made by these Defendants, First American's and United General's consistent, systemic and widespread failure to properly credit Maryland consumers the 40% Reissue Rate discount required by their own Filed Rates is especially troubling, though not at all surprising.

      **f.**    **The Named Plaintiffs in this case**

The scheme to cheat consumers alleged in this case is best illustrated through the circumstances of the named Plaintiffs in this case: (1) Patricia Mitchell-Tracey – who was overcharged for title insurance by Defendant United General and its agent Custom Title & Escrow in February 2005; (2) Milton Brown and Francine Byrd-Brown – who were overcharged in 2004 for title insurance by Defendant First American and its agent Express Financial Services; and (3) Helen Klatsky – who was overcharged for title insurance in 2005 by First American and its agent, Huntington Title & Escrow. The named Plaintiffs' transactions are typical of the classes that they represent.

      **i.**    *Patricia Mitchell-Tracey*

Patricia Mitchell-Tracey is a 57 year old African-American woman who works in community

23

affairs for the Johns Hopkins University Bloomberg School of Public Health. In September 2004 she purchased her home located at 5924 Frankford Avenue in Baltimore City for $152,170. In connection with her loan closing, Ms. Mitchell-Tracey purchased an Owner's title insurance policy – issued by United General – covering the full value of her home. A copy of Ms. Mitchell-Tracey's Owner's title insurance policy, is attached hereto as Exhibit 18.

In February 2005, only four months after her purchase, Ms. Mitchell-Tracey refinanced her home. The closing and settlement services were provided by United General's agent Custom Title & Escrow. The loan amount for Ms. Mitchell-Tracey's February 2005 refinance was $101,500. In connection with the February 2005 refinance, Custom Title & Escrow on behalf of its principal – Defendant United General – issued a Lender's title insurance policy with a face value of $101,500. Line 1108 of Ms. Mitchell-Tracey's February 2005 HUD-1 Settlement Statement, attached hereto as Exhibit 19, establishes that United General charged and collected from Ms. Mitchell-Tracey a premium of $319.26 for the Lender's title insurance policy.

Ms. Mitchell-Tracy, however, was entitled to the Reissue Rate which should have resulted in a discounted premium of $153.00. Ms. Mitchell-Tracey was overcharged $166.26.

For its part, United General readily admits that it had all of the information necessary to give Ms. Mitchell-Tracey the discount to which she is entitled. The Title Commitment for Plaintiff Mitchell-Tracey's loan transaction – explicitly identifies that she had only purchased her home four months before the refinance – in October 2004. *See* Ms. Mitchell-Tracey's Title Commitment attached hereto as Exhibit 20. This being the case, we also know that at least "90 to 95 percent" of all home buyers purchase an Owner's policy. Lynch depo at 49. Regardless, neither United General, nor its agent

Custom Title & Escrow ever asked Ms. Mitchell-Tracey to provide her prior Owner's policy.    Gregori

depo at 138.    In fact, Jacob Gregori, one of the principals of Custom Title & Escrow, testified that

Custom Title does not typically ask any borrowers for their Owner's policies.    Gregori depo at 98-99.

As noted above, United General's *Escrow & Settlement Guidelines* at 18,[10] Exhibit 13, require that – as

a precondition to receiving the Reissue Rate –  title agents must obtain a copy of the borrower's Owner's

policy **before** performing the title abstract.    As a result, according to Mr. Gregori, his company does not

typically request the Owner's policy: "***It would be nearly impossible to administer that***."    Gregori depo

at 157 (emphasis added).    Further, since Ms. Mitchell-Tracey did not, and could not have had any

contact with Custom Title prior to her closing, Ms. Mitchell-Tracey could never have obtained a Reissue

Rate under United General's own procedures.

       Ms. Mitchell-Tracey's experience with United General is neither unique nor isolated.    United

General summary of Custom Title's transactions for April 2005 – the same month that Ms. Mitchell-

Tracey's policy was issued – establishes that Custom Title issued Lender's title insurance policies in 124

refinance transactions.    ***Only 1 of the 124 consumers, however, received the Reissue Rate***. *See*

Underwriter Liability Report for Custom Title (April 2005), attached hereto as Exhibit 21.

       In discovery, United General also produced a spreadsheet of another one its agents – Capital

Title, which has locations throughout Maryland – demonstrating that that agent applied the Reissue Rate

in only ***1 out of 25 transactions***.    *See* Capital Title Transaction Spreadsheet, attached hereto as Exhibit

22.

---

[10] *See* Kosogof depo at 170 (establishing that United General's agents in Maryland are required to follow the
protocols set forth in the *Escrow & Settlement Guidelines*).

The reasons why very few United General customers receive the Reissue Rate are apparent: United General (1) conducts little oversight of its agents; (2) provides only limited advice; and (3) has in place a policy and protocol that runs counter to the Filed Rate that makes the Reissue Rate illusory for consumers.

### ii.    *Milton Brown and Francine Byrd-Brown*

Like Ms. Mitchell-Tracey, named Plaintiffs Milton Brown and Francine Byrd-Brown ("the Browns") also did not receive the Reissue Rate discount to which they were entitled. The Brown's purchased their home located at 3411 Kentucky Avenue in the Belair-Edison section of Baltimore City in 1997 for $75,000. In connection with their loan closing, the Browns purchased an Owner's title insurance policy covering the full value of their home. First Amended Complaint at ¶¶s 38-39. A copy of the Brown's Owner's title insurance policy, is attached hereto as Exhibit 23.

In January 2004, the Browns refinanced their home. The closing and settlement services were provided by Express Financial Services, Inc., an agent of First American. In connection with the January 27, 2004 refinance, Express Financial on behalf of its principal – Defendant First American – issued a Lender's title insurance policy with a face value of $95,000. First Amended Complaint at ¶¶s 40-42.

Although the Brown's January 27, 2004 HUD-1 Settlement Statement indicates that First American charged and collected from the Browns a premium of $237.50 for the Lender's title insurance policy, the Browns were entitled to a Reissue Rate premium of $142.50, which is a 40% discount off of the published rate in force for First American. First Amended Complaint at ¶¶s 43-44.

For its part, First American readily admits that it had all of the information necessary to give the

26

Browns the discount to which they were entitled.  According to Mr. Lynch of First American, either the Brown's Title Insurance Commitment or their previous HUD-1 Settlement Statement (showing that the Browns had paid for title insurance in a previous transaction) attached as Exhibits 24, and 25 respectively, would be sufficient to establish Mr. and Mrs. Brown's entitlement to the Reissue Rate under First American's Filed Rate.  *See* Lynch depo at 166-67.

> ### iii.    *Helen Klatsky*

Like Ms. Mitchell-Tracey and the Brown's, Ms. Klatsky also was entitled to, but did not receive the Reissue Rate.

Ms. Klatsky purchased her home in Reisterstown, Maryland  in June 2000 for $201,710. At the time, she purchased an Owner's title insurance policy, a copy of which is attached hereto as Exhibit 26, covering the full value of her home.  Prior to the loan transaction at issue in this case, Ms. Klatsky twice refinanced her home, each time purchasing a Lender's title insurance policy. *See* Exhibit 27.

Although First American's Filed Rate provides that any evidence of a prior Lender's *or* Owner's policy perfects the entitlement to the Reissue Rate – which should have resulted in a premium of $439.20 – when Ms. Klatsky refinanced her home again in March 2005, she was charged the ***full*** title insurance premium by First American and its agent, Huntington Title & Escrow – $706.00.  This was an overcharge by First American of $266.80.

Because the determination of entitlement to the Reissue Rate is a straightforward mathematical calculation grounded upon the Filed Rates, Lynch depo at 144, First American's official website (www.firstam.com) contains a worksheet that (1) asks certain questions about the borrowers; and then (2) calculates the appropriate rate to be charged.  During the deposition of First American, Mr. Lynch

27

was asked to review a page-by-page printout from that website that  analyzed the transaction of Ms. Klatsky.  *See* Exhibit 28, attached hereto; Lynch depo at 184-97.

After inputting all of the correct data concerning Ms. Klatsky's transaction, First American's own computer program established that Ms. Klatsky should have been charged a title insurance premium of $439.20, rather than $706.00:

| | | |
|---|---|---|
| Q. | Is that a number that you can rely upon as correct? |
| LYNCH. | We allow our agents to rely on it. |
| Q. | And this computer program takes into account all of the filed rates in Maryland, doesn't it? |
| A. | It should. |
| Q. | Now based upon Ms. Klatsky being charged $706 for the policy that she received and the quote which is $439.20 can you do the math for us on the calculator as to what the difference is?  [$]706 minus the amount that should have been charged. |
| A. | [$] 266.80. |

Lynch depo at 197.

### iv.    The Class is Not Limited to the Named Plaintiffs

The evidence in this case establishes that, in Maryland, First American and United General issued thousands of title insurance policies in refinance transaction that were identical to the Named Plaintiffs' transactions in this respect – the consumer was not charged the proper rate for title insurance. Although in the course of discovery in connection with this Motion for Certification both Defendants refused to identify the number of title insurance policies issued in the State of Maryland during the class period, it is undeniable that First American and United General collectively wrote tens-of-thousands of insurance policies and collected premiums *in excess of $50 million in fiscal year 2003 alone*. Lynch depo at 200; Kosogof depo at 160; Exhibit 17 (State of Maryland Report).   Moreover, First American and United General both acknowledge that the "period 2002 to just recently in 2005 has been the biggest

28

refinance boom in U.S. history." Lynch depo at 199; Kosogof depo at 123.

*Most* of the Lender's title insurance policies issued by First American and United General during the class period should have ***entitled*** the consumer to the Reissue Rate. We know this because: (1) the policies were issued in respect of refinances of existing mortgage loans that were significantly less than 10 years old (the age trigger for entitlement to the Reissue Rate)[11]; and, (2) the borrowers, as discussed in Parts I(b) & (f) above, invariably had a prior, valid Owner's or Lender's policy issued on the property. Thus, even though we do not know the exact number of consumers who were entitled to the Reissue Rate, but were charged a higher rate, one would expect that the percentage would be quite high.

A review of the title agent records (who conducted the transactions for the Named Plaintiffs) produced by Defendants, though, indicates that during this "boom" period, where most refinances were for loans only 2 years old (*see* footnote 11, *infra*), the Reissue Rate was rarely if ever given. For example, as noted in Part I (f)(i), above, we know that for United General, the percentage of consumers receiving the Reissue Rate was abysmal. Of the 124 loan refinance transactions closed by Custom Title & Escrow in April 2005, ***only one consumer*** – or .8% – was given the discounted Reissue Rate. See Exhibit 21. A transaction summary sheet of another one of United General's Maryland agents, Capital Title, Exhibit 22, similarly shows ***only one in twenty-five consumers*** receiving the Reissue Rate. *See* Capital Title Transaction Spreadsheet, Exhibit 22; Kosogof depo at 143-49 (reviewing Capital Title transactions). The reason for such a low percentage is apparent – as discussed above, United General published guidelines for its agent adopted a protocol that made it a virtual certainty that no consumer would be given the Reissue Rate. *See Escrow & Settlement Guidelines* at 18, Exhibit 13.

With respect to First American, the percentages are only slightly higher, though, based upon First American's Filed Rate – where consumers are ***automatically entitled*** to the Reissue Rate if there is ***any evidence*** of a prior title policy  (*see* Exhibit 10) – a very high rate of entitlement to the discount is expected.   Nonetheless, the transaction logs produced for two of First American's agents – Huntington Title and Express Financial – indicate that the Reissue Rate was given only about 10-12% of the time. *See* Exemplars of First American's "Reports of Remitted Policies," Huntington Title and Express Title are attached hereto as Exhibits 29 and 30, respectively; Lynch depo at 154-157 (discussing method and ease of calculating proper rates in Maryland).[12]

## II.    THE COURT SHOULD CERTIFY THE CLASS IN THIS CASE

### a.    Governing Principles

#### i.    *Rule 23 Favors certification*

Many courts interpret Rule 23 to favor the maintenance of class actions.   *See e.g., In re Amerifirst Sec. Litig.,* 139 F.R.D. 423, 427 (S.D. Fla. 1991) ("the interests of justice require that in a doubtful case … any error, if there is to be one, should be committed in favor of allowing a class action"); *see also Frost v. Mazda Motors of America, Inc.,* 353 N.C. 188, 193, 540 S.E. 2d 324, 327-328 (N.C. 2000) (same); *Smith v. Behr Process Corp.,* 113 Wash. App 306, 54 P.3d 665 (Wash. App 2002)

---

[11] A recent study issued by the Joint Center for Housing Studies of Harvard University found that  consumers hold their mortgage loans, on average, for only 2 years before refinancing.  Joint Center for Housing Studies of Harvard University, *The State of the Nation's Housing 2005* at 6 and Appendix A-4, attached hereto as Exhibit 32.

[12]   Messrs. Lynch and Kosogof both agreed that the calculation of the rate charged in any particular transaction – including whether the rate accorded the Reissue Rate discount – can be easily discerned from United General's "Transaction Spreadsheet" or First American's "Report of Remitted Policies."  Lynch depo at 153-57; Kosogof depo at 145-148.  It is a matter of simple math – i.e., "Gross Premium" ÷ ("Face Value of the Lender's Policy" [ROUNDED TO THE NEXT 1,000]/1,000).  Thus, using the very first transaction identified on the Huntington Title Report as an example, – where the "Gross Premium" is $450.00 and the "Face Value of the Lender's Policy" is $150,000.00 – we can easily determine that: (1) the Rate charged to the consumer was $3.00/1,000; and (2) the consumer did not receive the "Reissue Rate."   Had the consumer been charged the "Reissue Rate," it would have resulted in a 40% lower premium – $270.00 or $1.80/1,000.

(same).  The reason to favor class certification is that class action lawsuits are **essential**, and often the

only practical way, to enforce consumer protection laws.

> In a large and impersonal society, class actions are often the last barricade of consumer
> protection . . . .  To consumerists, the consumer class action is an inviting procedural
> device to cope with frauds causing small damages to large groups.  The slight loss to the
> individual, when aggregated in the coffers of the wrongdoer, results in gains which are
> both handsome and tempting.  The alternatives to the class action -- private suits or
> governmental actions – have been so often found wanting in controlling consumer frauds
> that not even the ardent critics of class actions seriously contend that they are not  truly
> effective.  The consumer class action, when brought by those who have no other avenue
> of legal redress, provides restitution to the injured, and deterrence of the wrongdoer.

*Eshaghi v. Hanley Dawson Cadillac Co.*, 214 Ill. App. 3d 995, 574 N.E. 2d 760, 764 (Ill. 1991).

This approach was recently echoed by this Court in *Arrington v. Colleen*, Inc., 2001 WL

34117734 (D.Md.):

> Class certification is a useful tool which can economize and focus judicial resources by
> allowing the court to consolidate similar claims and provide consistent and conclusive
> final judgments. Class certification also allows claims that may not otherwise be brought,
> because the cost of bringing the individual claim is prohibitive when the remedy is either
> injunctive relief or small monetary damages.

2001 WL 34117734 at *1.

Simple consumer cases such as this one are routinely certified as class actions by courts in

Maryland and elsewhere.  The United States Supreme Court recently noted that cases involving

consumer or securities fraud or violations of anti-trust laws are especially appropriate for class action

treatment. *Amchem Product, Inc. v. Windsor,* 521 U.S. 591, 625 (1997). *See also Peoples v. Wendover*

*Funding, Inc.*, 179 F.R.D. 492, 497 (D.Md. 1998) (certifying consumer class action against loan

servicer); *Twyman v. Rockville Housing Auth.*, 99 F.R.D. 314 (D. Md. 1983) (class of more than 150

tenants in low-income public housing certified regarding Housing Authority involving rent, eviction and

maintenance); *Guarte v. Furniture Fair, Inc*, 75 F.R.D. 525 (D. Md. 1977) (class of furniture store customers certified regarding practices violating Truth-in-Lending Act); *Kohl v. Assoc. of Trial Lawyers of America*, 183 F.R.D. 475 (D. Md. 1998) (class of retirees certified alleging violation of  ERISA).

> ### ii.    This is the very type of case for which the Class Action Mechanism was Established

This Court should find that the allegations against First American and United General – involving uniform overcharges in connection with the issuance of title insurance – raise questions that can and should be resolved, once and for all, in a class action.  The legal and factual issues which will control resolution of this case for the Named Plaintiffs and for all Class members are relatively simple and straightforward.  Indeed, this case does not present nearly the complexity of anti-trust or other types of cases which are commonly certified as class actions.  *See, e.g., In Re A. H. Robbins Co., Inc.*, 880 F.2d 709 (4th Cir.), *cert. denied*, 493 U.S. 959 (1989) (mass tort); *In Re Carbon Dioxide Anti-Trust Litigation*, 149 F.R.D. 229 (M.D. Fl. 1993); *Phillips Petroleum Company v. Shutts*, 472 U.S. 797 (1985) (securities fraud).

### b.    Legal Requirements for Certification

Rule 23 states that "at an early practicable time" the Court must determine whether to certify the case as a class action.   Four requirements for class certification are set forth in section (a) of the Rule. If all four requirements are satisfied, the Court then looks to section (b) to determine whether any of three additional criteria is present.

The four requirements of Rule 23(a) are:

    (1)    The class is so numerous that joinder of all members is impracticable,

    (2)    There are questions of law or fact common to the class,

    (3)    The claims or defenses of the representative parties are typical of the claims or

defenses of the class, and,

(4)    The representative parties will fairly and adequately protect the interests of the class.

All four requirements of part (a) are met in this case.

### (a) (1)    **Numerosity**

The focus of the numerosity requirement of Rule 23 is judicial economy. The rule does not set out a precise numerical standard, but presents an impracticability of joinder requirement, of which class size is an inherent consideration." 1 H. Newberg and A. Conte, *Newberg on Class Actions*, § 3:5 (4th ed. 2003). *Peoples v. Wendover Funding, Inc.*, 179 F.R.D. 492, 497 (D.Md. 1998).

Thus, class sizes of 30-40 members usually raise a presumption that the numerosity requirement is satisfied:

> Certainly, when the class is very large – for example, numbering in the hundreds – joinder will be impracticable; but in most cases the number that will, in itself, satisfy the Rule 23(a)(1) prerequisite should be much lower... In light of prevailing precedent, the difficulty inherent in joining as few as 40 class members should raise a presumption that joinder is impracticable, and the plaintiff whose class is that large or larger should meet the test of Rule 23 (a)(1) on that fact alone.

1 H. Newberg and A. Conte, *Newberg on Class Actions*, § 3:5 (4th ed. 2003).    *See also Peoples v. Wendover Funding*, 179 F.R.D. 492, 497 (D.Md. 1998) (noting that "[i]mpracticability refers only to difficulty, not impossibility"); *Dameron v. Sinai Hospital of Baltimore, Inc.*, 595 F. Supp. 1404, 1408 (D. Md. 1984). Classes with as few as 18 members have been certified. *See e.g. Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n.*, 375 F.2d 648 (4th Cir. 1967). Plaintiffs need not show the precise number of members in the class, *Evans v. U.S. Pipe & Foundry Co.*, 696 F.2d 925, 930 (11th Cir. 1983); *Folsum v. Blum*, 87 F.R.D. 443, 445 (S.D.N.Y. 1980), because "a contrary rule would

foreclose most class litigation ...″  1 Newberg and A. Conte, *Newberg on Class Actions*, § 3:5 (4th ed. 2003).

Although, as noted above, both Defendants refuse to identify the number of title insurance policies issued in the State of Maryland during the class period, it is undeniable that First American and United General collectively wrote tens-of-thousands of insurance policies and collected premiums, in fiscal year 2003 alone, ***in excess of $50 million***. Lynch depo at 200; Exhibit 17 (State of Maryland Report).  Moreover, First American and United General admit that the "period 2002 to just recently in 2005 has been the biggest refinance boom in U.S. history."  Lynch depo at 199; Kosogof depo at 123. Thus, even though we do not know the exact number of consumers who were entitled to the Reissue Rate, but were charged a higher rate, the records produced to date show that very few consumers actually were given the rate.  Given the frenetic activity in the mortgage industry between 2002 and 2005, one would expect, based on general knowledge and common sense, that the number of consumers entitled to the Reissue Rate would be quite high, and certainly more than 30-40. Moreover, even a cursory examination of a single spreadsheet of a single agent in this matter reveals that the vast preponderance of consumers clearly eligible to receive the discounted Reissue Rate, have not received the rate at all.

In this circumstance, the numerosity prong of Rule 23 is satisfied.  As Professor Newberg notes:

The numerosity requirement is met when plaintiffs demonstrate that the number of potential class members is large, even if plaintiffs do not know the exact figure. Where the exact size of the class is unknown but general knowledge and common sense indicate that it is large, the numerosity requirement is satisfied.

1 *Newberg on Class Actions* § 3:3 (4th ed. 2004).

### (a)(2)  <u>Commonality of Issues</u>

Rule 23 (a)(2) requires only that there be a single common question of law **or** fact in order for

the court to certify the class action.

This case raises numerous questions of both law and fact which are common to the class.

The common issues include the following:

> (a)     Whether the Defendants and their agents systematically collected premiums from Class Members in amounts not permitted under the Maryland Insurance Code;
>
> (b)     Whether by filing their reissue rates with the State of Maryland, the Defendants were offering insurance at a certain price and that the class is entitled to receive that price;
>
> (c)     Whether the Defendants' protocols, guidelines and oversight of their agents, precluded the Class from receiving the Reissue Rates to which they were entitled;
>
> (d)     Whether the Defendants uniformly applied the Reissue rate discount under their Filed Rate;
>
> (e)     Whether the Defendants and their agents intentionally and/or negligently omitted to disclose material facts to the Named Plaintiffs and the Class that they need only pay the discounted premiums for the reissuance of title insurance on the refinancing of their mortgages or fee interests;
>
> (f)     Whether the Defendants and their agents were unjustly enriched by their improper conduct;
>
> (g)     Whether the Defendants and their agents should be enjoined from further engaging in such improper conduct;
>
> (h)     Whether the Defendants and their agents were part of a conspiracy that harmed the Class;
>
> (i)     Whether the Defendants and their agents split fees in connection with the provision of settlement services on federally related mortgage loans in violation of RESPA;
>
> (j)     Whether Named Plaintiffs and members of the Class have sustained damages and the proper measure of such damages; and,
>
> (k)     Whether the Defendants and their agents paid and/or received illegal referral and unearned fees of the title insurance issued to the Class.

"It is important to note that [subdivision (a) (2)] does not require that all questions of law and

fact raised by the dispute be common ..."  C. Wright and A. Miller, *Federal Practice and Procedures*,

§1763 at 12681 (West 1994); *Arrington v. Colleen*, Inc., 2001 WL 34117734, *3 (D.Md.). In fact, a **single** common question has been deemed sufficient to satisfy the commonality requirement. *Peoples v. Wendover Funding*, 179 F.R.D. 492, 498 (D. Md. 1998) (holding that a single common issue is sufficient to satisfy commonality); *German v. Federal Home Loan Mortgage Corp.*, 885 F. Supp. 537, 553 (S.D.N.Y. 1995) citing *Trief v. Dun & Bradstreet Corp.*, 144 F.R.D. 193, 198 (S.D.N.Y. 1992). "***Thus, factual differences among class members' cases will not preclude certification if the class members share the same legal theory***." *Peoples,* 179 F.R.D. at 498 (*citing Brown v. Eckerd Drugs, Inc.,* 663 F.2d 1268, 1275 (4th Cir.1981), *vacated on other grounds,* 457 U.S. 1128 (1982)) (emphasis added).

The pertinent factual and legal issues in this case clearly are common to the class. Here, the scope of the central question pertinent to the class members – whether the class members were entitled to the Reissue Rate under the Filed Rates of the Defendants – are identical in all material respects. Also identical is the fact that First American and United General's stated protocols and written guidelines, and lack of oversight of their agents' activities, precluded the class from receiving the Reissue Rate. Likewise, the inquiry in this case will focus on standardized forms that are not only uniform in respect of each Defendants' operations, but are consistent throughout the title insurance industry. Finally, Plaintiffs note that the assessment of damages in this case is a straightforward mathematical calculation. First American could not have been more emphatic on this point – "*It is a mathematical certainty*." Lynch depo at 144.

Legal and factual questions will be viewed as commonly shared so long as "their resolution does not depend on the facts of any class member's particular claims, but depends rather on the evidence

presented taken as a whole." *Chapelle v. E.I. DuPont DeNemours & Co.*, 75 F.R. D. 74, 77 (E.D. Va. 1977). The practices alleged in this case were uniformly applied through form-driven settlement procedures. These forms were supplied by First American and United General to their appointed agents, and did not vary from one borrower to another. Thus, in regard to the class claims, no extraordinary facts existed in the individual Plaintiff's experience.

The requirement of commonality is satisfied where, despite some minor factual differences, the question of law linking the class is substantially related to the resolution of the litigation (i.e., all class members' rights were violated and relief should be awarded). *Himmler v. Weinberger*, 422 F. Supp. 196, 199 (E.D. Mich. 1976), rev'd on other grounds, 611 F.2d 137 (6th Cir. 1979), *citing American Finance System, Inc. v. Harlow*, 65 F.R.D. 94, 107 (D. Md. 1974); *Harris v. Palm Springs Alpine Estates*, 329 F.2d 909 (9th Cir. 1964). In *American Finance System, Inc. v. Harlow*, for example, several different subclasses with widely varied factual circumstances in relation to contract and period of employment brought a Title VII suit. However, because the resolution of all claims depends on the resolution of unified legal questions, the requirement of commonality was satisfied. In the present case, not only are factual differences slight and irrelevant to the claims, uniform questions of law determine whether relief will be granted. The requirement of commonality is satisfied.

### (a)(3)   **Typicality of Claims**

Each class member's claim is typical:

[T]he typicality prerequisite of Rule 23(a) has been construed to require that the relief sought will benefit all class members and that no individual claim within the class be so unique as to impair the necessary alignment of interest. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974)) ... [A] general course of conduct by the opposing party which affects the entire class to a same or similar degree, will substantiate the appropriateness of class action status. *Kaufman v. Lawrence*, 76 F.R.D. 397 (S.D.N.Y. 1977).

*Ramirez v. Webb*, 102 F.R.D. 968, 971 (W.D. Mich. 1984).

The facts underlying the Named Plaintiffs' transactions are as straightforward as they are typical. Prior to the title insurance transactions at issue in this case, each Named Plaintiff had – within the previous 10 years – either purchased their home or refinanced it in a transaction that resulted in the issuance of a valid title insurance policy. Because of the Defendants' stated protocols and written guidelines and the lack of oversight of their agents' activities, none of the Named Plaintiffs received or were even offered the Reisssue Rate – a full 40% discount – when they refinanced. Like all class members, Patricia Mitchell-Tracey, Helen Klatsky and Mr. and Mrs. Brown were legally entitled to the discount under Defendants' Filed Rates with the State of Maryland. Like all of the class members, however, the Named Plaintiffs did not receive the rate. The very legal issues raised in the Complaint are demonstrated through the Named Plaintiffs' transactions.

As stressed in *Peoples*, "[t]he test for determining typicality is whether the claim or defense arises from the same course of conduct leading to the class claims, and whether the same legal theory underlies the claims or defenses." 179 F.R.D. at 498. "Thus, while the claims of particular individuals may vary in detail from one to another, the collective claims focus on particular policies applicable to each class member thereby satisfying the typicality requirement of Rule 23 (a)." *Briggs v. Brown & Williamson Tobacco Corp., Inc.*, 414 F. Supp. 371, 375 (E.D. Va. 1976).

In this case, Plaintiffs' claims present virtually identical fact patterns and legal theories which each class member would have to present if he or she filed an individual suit. The claim of every class member is based upon the same conduct by First American and United General. The Named Plaintiffs'

claims are, therefore, not only typical of the claims of the class, they are virtually identical to them.  *See*, *Kohl v. Assoc. of Trial Lawyers of America*, 183 F.R.D. 475, 484 (D. Md. 1998).

### (a)(4)   **Adequacy of Representation**

The standards of Rule 23(a)(4) are met if it appears that the named plaintiffs' interests are not antagonistic to those of other class members and that the plaintiffs' attorneys are qualified, experienced, and generally able to conduct the litigation.  *See e.g., Peoples v. Wendover Funding,  Inc.,* 179 F.R.D. 492, 499 (D.Md.1998); *Bogosian v. Golf Oil Corp.*, 561 F.2d 434, 449 (3d Cir. 1977), *cert. denied*, 434 U.S. 1086 (1978); *Wetzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239, 247 (3d Cir.), *cert. denied*, 421 U.S. 1011 (1975); *Brown v. Cameron-Brown*, 92 F.R.D. 32 , 40-41 (D.C. Va. 1981).

The requirement of adequate representation is not a search for a perfect plaintiff with an unassailable claim.  The requirement merely assures that absent class members, who will be bound by the result, are protected by a vigorous and competent prosecution of the case by someone who shares their interests.  *See* 1  Newberg and A. Conte, *Newberg on Class Actions*, § 3:21 (4th ed. 2004); *see also George v. Baltimore City Public Schools*, 117 F.R.D. 368, 371 (D. Md. 1987).  The Court needs to ensure "that the relationship of the representative parties' interests to those of the class are such that there is not likely to be divergence in viewpoint or goals in the conduct of the suit." *Bogosian*, 561 F.2d at 449.

The Named Plaintiffs in this case have no claim or interest that conflicts with those of the Class. They have followed this case diligently and have already given their depositions, answered Interrogatories and produced hundreds of documents.

Likewise, Plaintiffs and the Classes in this case are represented by competent and experienced

counsel who have represented numerous classes in actions involving consumer frauds and other legal violations.  As set forth in the attached Affidavit of Counsel, Exhibit 31, Richard S. Gordon has served as counsel, and often lead counsel in more than 20 class actions, including cases in this Court.  Similarly, Philip S. Friedman has served as lead class counsel in more than a dozen class actions throughout the country, and actually teaches Maryland CLE courses on the class action rule.  Likewise, Phillip O. Foard has substantial experience in consumer class action litigation.  A detailed list of Class Counsel's cases are set forth in Lead Counsel's Affidavit.

     **c.**     **A Class Action Is Appropriate Because the Criteria of Rule 23(b) Are Satisfied**

After finding that all four requirements of Rule 23(a)  have been met, the Court should certify the case as a class action *if any* one of three criteria in part (b) of the Rule is satisfied.  All  three criteria are satisfied in this case.

### Rule 23(b)(1)

Here, the causes of action brought by the Plaintiffs form the necessary backdrop to certify this as a 23(b)(1) class action.[13]  Each of the causes of action brought by the Plaintiffs seeks to enforce duties and obligations owed the members of the class in common, collectively and indivisibly.  Consequently, inconsistent or varying adjudication of claims to enforce those duties or obligations with respect to individual members of the class would establish incompatible standards of conduct for the defendant [Rule 23 (b)(1)(A)]; and adjudications with respect to individual members of the class would as a

---

[13] A 23(b)(1) class action is maintainable if:
(1)       The prosecution of separate actions by or against individual members of the class would create a risk of
(A)      inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

practical matter be dispositive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests. [Rule 23(b)(1)(B)]. *See DeBoer v. Mellon Mortg. Co.,* 64 F.3d 1171, (8th Cir. 1995)(where claims of individual plaintiffs would essentially determine liability, a (b)(1) certification is appropriate against a bank for overescrowing accounts). *Cass Clay Inc. v. Northwestern Public Service Co.,* 63 F.R.D. 34, 36-37 (D.S.D. 1974) (23(b)(1) requirements met in action against utility company for overcharging customers where distribution of overcharges to customers would come from one fund).

Whether the cause of action is predicated on the issue of whether the Defendants failed to provide the tarriffed reissue rate to class members is impermissible as a matter of Maryland Law, or a direct violation of RESPA, the fact remains that each action is a claim for a breach of an integrated duty owed by the Defendants to their individual customers. Each cause of action is objective in nature and is the same claim no matter which customer pursues the claim. Each claim is not particularized or differentiated by the peculiar or personal characteristics of any class member. Simply stated, either the Defendants' actions are in violation of the law, or they are not. *See Zachary v. Chase Manhattan Bank*, 52 F.R.D. 532, 534 (S.D.N.Y. 1971) (action against bank for making finance charges in excess of legal rate certified as (b)(1) action since as a practical matter individual action would be dispositive of claims of the class). If the acts of the Defendants do violate the law, then the identical cause of action exists in favor of all the persons to whom the conduct is directed. Moreover, should the Plaintiffs prevail on their RESPA claims, the Defendants may well be subject to treble damages (*See e..g.* 12 U.S.C. § 2607(d)(2)

---

(B)     adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

making potential claims against a fund that may be insufficient to satisfy all class members.  Thus, any individual action by the Plaintiffs, or any other aggrieved customer has the potential to diminish that limited pool of funds against which customers who have paid excessive late fees may be compensated. Where such circumstances exist, as here, the action should be certified as a 23(b)(1) class action. *Cass Clay Inc. v. Northwestern Public Service Co.,* 63 F.R.D. 34, 36-37 (D.S.D. 1974).

### Rule 23 (b)(2)

First American and United General have each uniformly and consistently violated class members' rights in charging and collecting title insurance premiums in excess of the rate permitted by the law and in violation of their own Filed Rates.  Plaintiffs seek equitable relief in the form of restitution on behalf of class members and an injunction against any such activity in the future.  Section (b)(2) of the Rule states that a class action is maintainable where:

> the party opposing the class has acted or refused to act on grounds generally applicable to the class thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole...

*See also George v. Baltimore City Public Schools*, 117 F.R.D. 368, 372 (D. Md. 1987).  What is necessary for certification under part (b)(2) is that the challenged conduct by the defendant be premised on a ground that is applicable to the entire class.  *Heastie v. Community Bank of Greater Peoria*, 125 F.R.D. 669 (M.D. Ill. 1989).

In this case, Plaintiffs allege that Defendants engaged in a scheme to cheat and deceive borrowers that resulted in higher title insurance premiums. Through the use of standard contract forms and standard corporate practices, both Defendants have acted on grounds applicable to the class as a whole.

Rule (b)(2) is appropriate here even though Plaintiffs seek statutory damages and other monetary relief against the Defendants.  In fact, the Court should approve Rule (b)(2) certification in this case because Plaintiffs' claim for an injunction for the class provides the structural basis for which the other claims are presented.  In this regard, Plaintiffs reiterate that the Complaint in this case alleges that the Defendants have acted in contravention of the requirements of their own Filed Rates.   Accordingly, the equitable relief sought by Plaintiffs and the classes goes to the essence of this case.  The fact that the Named Plaintiffs seek repayment of the overcharges, as well as statutory damages under RESPA,  does not exclude this case from treatment under subsection (b)(2), because the relief sought by Plaintiffs does not relate exclusively or predominately to monetary damages.  *Ramirez v. Webb*, 102 F.R.D. 968, 971 (W.D. Mich. 1984).

### **Rule 23 (b)(3)**

Class certification is also appropriate under part (b)(3) of *Fed.R.Civ.P.* 23 because the most important issues in this case, both factually and legally, are predominantly common to the classes.   For individual borrowers who were denied the Filed Rate discount – whose damages vary from a few dollars to several hundred dollars – there is little to gain by way of individual suits for damages, making class action adjudication the only practical way in which the consumers can obtain relief against First American and United General. This is the situation addressed by Rule (b)(3) which states that a class action is maintainable where:

> The court finds that questions of law or fact common to the members of the class dominate over any questions affecting only individual members and that a class action is superior to the other available methods for the fair and efficient adjudication of the controversy.

It is black letter law that in determining whether common issues predominate, the Court's inquiry should be directed primarily toward the issue of liability. *See Bogosian v. Gulf Oil Corp.*, 561 F.2d at 456; *see also, Snider v. Upjohn*, 115 F.R.D. at 541; *In re Sugar Industry Antitrust Litigation*, 73 F.R.D. 322, 345 (E.D. Pa. 1976).

This case focuses on the uniform and consistent practice of the Defendants' collection of title insurance premiums from Class Members in amounts that are not permitted under the Maryland Insurance Code. It also focuses on whether the Defendants' protocols, guidelines and oversight of their agents, precluded the Class from receiving the Reissue Rate discounts to which they were entitled. These practices give rise to common issues of law and fact which predominate over any possible individual issues in this case.

As this Court has stressed: "Generally, certification under this Rule is appropriate when settling the parties' differences in a single proceeding serves their interests by achieving 'economies of time, effort, and expense,' and by promoting uniformity of decisions as to similarly situated class members without sacrificing fairness." *Peoples*, 179 F.R.D. at 501 (*quoting Amchem Product, Inc. v. Windsor*, 521 U.S. 591, 615 (1997)). As the United States Supreme Court recognized in *Amchem Product, Inc. v. Windsor*, 521 U.S. 591 (1997):

> Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws.

*Id*. at 625.    In fact, as noted above, the common questions of law and fact are virtually the ***only*** issues in this case.

In *Arrington v. Colleen, Inc.*, 2001 WL 34117734 (D.Md.), this Court, in certifying a consumer

class alleging TILA violations, wrote that:

> In determining whether a class satisfies the requirement of Rule 23(b)(3), a court should consider: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the difficulties likely to be encountered in the management of a class action.

*Id*. at *8.

Based upon this analysis, it is clear that certification is appropriate.  First, it is unlikely that individual plaintiffs would have the resources to pursue their claims – especially since the claims are consistently only a few hundred dollars.  As one court has noted:

> This is precisely the kind of case that class actions were designed for, with small or statutory damages brought by impecunious plaintiffs who allege similar mistreatment by a comparatively powerful defendant, one that, if the fact alleges were proved, otherwise might get away with piecemeal highway robbery by committing small violations that were not worth the time and effort of individual plaintiffs to redress or were beyond their ability or resources to remedy.

*Jackson v. Check'N Go of Illinois, Inc.*, 193 F.R.D. 544, 547  (N.D.Ill.2000).  Second, Plaintiffs are not aware of any other similar litigation commenced by the putative class members. Third, judicial resources are economized and focused by handling this case as a class action.  *Arrington v. Colleen, Inc.*, 2001 WL 34117734 at *8  Indeed, unless the class members obtain relief through this class action, most of the class will not obtain any relief at all.  There simply is no other practical means for this class to challenge a practice which stands in clear violation of controlling law.  "The desirability of providing recourse for the injured consumer who would otherwise be financially incapable  of bringing suit and the deterrent value of class litigation clearly render the class action a viable and important mechanism in challenging

fraud on the public" 6 H. Newberg and A. Conte,  *Newberg on Class Actions* § 21:30 (4th ed. 2003).

Finally, there are no manageability issues that would preclude certification, even though the proposed classes could include thousands of class members.   The issue of "manageability" was recently discussed in *In Re: Visa Check/Master Money Antitrust Litigation*, 280 F.3d. 124 (2nd Cir. 2001), *cert. denied*, 122 U.S. 2382 (2002).   In that case, the Second Circuit affirmed the certification of a class which consisted of every business in the United States, large and small, which accepted Visa and/or MasterCard credit cards.   The class literally consisted of millions of businesses in all of the fifty states ranging in size from WalMart to the local dry cleaner.   The defendants' major challenge on appeal was on the issue of manageability.   The Second Circuit first disposed of defendants' argument that individualized proof of damages should preclude certification, saying that "the fact that there may have to be individual examinations on the issue of damages has never been held, however, a bar to class actions," 280 F.3d at 139.   On the general issue of manageability, the Court stated:

> [F]ailure to certify an action under Rule 23(b)(3) on the sole ground that it would be unmanageable is disfavored, and should be the exception rather than the rule.

*Id*. at 140 (citations omitted).

In this case, there are no management issues with respect to the classes defined above.   Both the First American and United General Classes can be identified from the Defendants' own records, or from the records of their agents.   Both Defendants testified in this case that, in addition to the information gathered and maintained by each of their agents – including, but not limited to the information contained in the Title Insurance Commitment  – both First American and United General compile comprehensive and detailed ***electronic*** information for each and every policy issued.   Mr. Lynch even testified that First

American has the capability to provide electronically *just about any type of information about the transaction and the borrower*.  Lynch depo at 152.

As a result, delivery of any notice under Rule 23 (c)(2) will not be unduly difficult; nor are there other manageability issues that will hamper the management of this case as a class action.

Recognizing that consumer class actions in general are easy to manage, and understanding that in the absence of a class action, a failure of justice will result, numerous courts have found the class action approach superior in similar cases involving common law fraud claims and claims under consumer protection statutes. *See, e.g. Peoples v. Wendover Funding, Inc.*, 179 F.R.D. 492 (D.Md. 1998) (class of consumers whose rights under the Fair Debt Collection Practices Act were violated); *Chisolm v. TranSouth Financial Corp.*, 184 F.R.D. 556, 562-63 (E.D.Va. 1999) (certifying consumer class against finance company); *Singh v. Prudential Health Care Plan*, Civil Action No. AW-00–2168 (U.S. Dist. Ct. Md.) (certified August 2, 2005) (certifying consumer class action against HMO), attached hereto as Exhibit 33.

In fact, Courts have long recognized that "[c]lass action certifications to enforce compliance with consumer protection laws are 'desirable and should be encouraged.'"  *Watkins v. Simmons and Clark, Inc.*, 618 F.2d 398, 404 (6th Cir. 1980).  Not only does class certification enable class members to share in a financial recovery which they might otherwise never pursue on their own behalf, but it also 'provides an opportunity to educate a segment of the public, those included in the class, of the obligations which creditors owe to them as credit consumers.' *Id.*

Accordingly, a class action is both manageable and far superior to that of individual claims.

## III.   COURTS IN THREE DIFFERENT STATES HAVE RECENTLY CERTIFIED VIRTUALLY IDENTICAL CLASS ACTIONS

At least three different Courts, in three separate states, have considered, and certified, consumer classes alleging failures to pay mandated reissue discounts. These cases present facts virtually identical to the facts alleged against First American and United General in this case and  provide clear guidance for the Court to certify this matter.

a.    **In New York State, the Court Certified *In re Coordinated Title Insurance Cases***

In *In re Coordinated Title Insurance Cases*, 784 N.Y.S.2d 919, 2004 WL 690380 (N.Y. Sup. 2004), a group of consumers brought a series of class actions against 8 title insurers – including First American – arguing, like this case,  "that defendants routinely collected premiums in excess of that to which they were legally entitled in connection with refinance transactions." *Id*. at *1.   After discussing the nefarious nature of the title insurance industry as a whole, and the fact that title insurance premiums result in almost pure profit for the insurers – noting in particular that "[n]ews reports indicate that title insurers pay out 47 cents for every $10 collected," *id*. – the Court certified the class.

A key consideration for the New York court was the fact that "the failure of the defendants to charge the mandated, discounted premium for a refinance was the result of routine, material omissions." *Id*. at *3.  Plaintiffs support their allegation in this regard with deposition testimony of representatives of the defendant title insurance companies.   That testimony – much like the unambiguous deposition testimony of First American and United General in this case – suggested that the insurers did not conduct the proper oversight and did not have a general practice, policy or procedure to disclose "the potential availability of the mandated discount to qualified re-financiers." *Id*.

b.    **In Ohio, the Appellate Court Recently Reversed the Denial of Class Certification**

48

In Ohio, in *Dubin v. Security Title Insurance Co.*, 832 N.E.2d 815 (Ohio 2005), the Court of Appeals recently reversed the trial court's denial of certification in another action alleging that the defendant insurers had failed to apply the proper discounted premium rate for lender's title insurance. *See* footnote 8, infra.

### c.    The Minnesota Courts, as well, Certified An Identical Class Action

Like the New York and Ohio class certification decision, the Minnesota court in *Mitchell v. Chicago Title Ins. Co.*, 2003 W.L. 23786983 (Minn. Dist. Ct. Dec. 22, 2003), certified a class of borrowers who were denied the Reissue Rate.  In so doing, the Court considered the fact that the defendant insurer, like in this case, had at its disposal much of the information on prior policies necessary to raise a significant presumption of entitlement to the discounted rate, but chose to ignore that information.  "Plaintiffs' lawsuit will focus not upon whether persons were given proper notice of the reissue rate, but more on what information *Chicago Title* had available to it and whether, assuming the existence of that information, Chicago Title should have applied the discount without the suggestion of its customers."  *Id.* at *6 (emphasis in original).

Moreover, the alternative to certification, the Minnesota Court observed – where each class member would be forced to start his own lawsuit – was not be preferred; individual class members are unlikely to bring lawsuits over such relatively small amounts of money.

## IV.    CONCLUSION

This case raises important factual and legal issues for thousands of consumers, issues which are common to all. The Named Plaintiffs share all of these claims and are committed to bringing them forward to a resolution on behalf of all class members.  The only practical method for adjudicating this

49

case is through class certification.  The Court should certify the two defined classes as proposed.

Respectfully submitted,


_____/s/_____
Richard S. Gordon, Federal Bar No.  06882
Kieron F. Quinn, Federal Bar No.  00393
QUINN, GORDON & WOLF, CHTD.
102 West Pennsylvania Ave., St. 402
Baltimore, Maryland  21204
(410) 825-2300

Philip Friedman, Federal Bar No. 22766
FRIEDMAN LAW OFFICES, PLLC
2401 Pennsylvania Ave., N.W., Suite 410
Washington, DC 20037
(202) 293-4175

Philip Foard, Federal Bar No. 00280
Foard, Gisriel,O'Brien & Ward
29 W. Susquehanna Ave., Suite 302
Towson, MD 21204
(410) 296-1440

Attorneys for Plaintiffs

50